UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br><br>           v.<br><br>1.) Diego COLIO-Jimenez,<br><br>2.) Joaquin CHAVEZ-Carbajal<br>           Defendant(s) | Magistrate Case No.<br>08 JAN 28 AM 11:08  '08 MJ 0246<br><br>COMPLAINT FOR VIOLATION OF:<br><br>Title 8 U.S.C., Sec. 1324 (a)(1)(A)(ii)<br>Transportation of Illegal Aliens<br><br>Title 8 U.S.C., Sec. 1324 (a)(2)(B)(iii)<br>Bringing in Illegal Aliens Without Presentation |

The undersigned complainant, being duly sworn, states:

COUNT ONE

On or about **January 22, 2008,** within the Southern District of California, defendant **Diego COLIO-Jimenez** with the intent to violate the immigration laws of the United States, knowing and in reckless disregard of the fact that aliens, namely, **Erika GARCIA-Martinez, Cecilia LOZANO-Velasquez, Damian GARCIA-Garcia, and Jane DOE** had come to, entered and remained in the United States in violation of law, did transport and move, said aliens within the United States in furtherance of such violation of law; in violation of Title 8, United States Code, Section 1324 (a)(1)(A)(ii).

COUNT TWO

On or about **January 22, 2008,** within the Southern District of California, defendant **Joaquin CHAVEZ-Carbajal**, with the intent to violate the immigration laws of the United States, knowing and in reckless disregard of the fact that aliens, namely, **Erika GARCIA-Martinez, Cecilia LOZANO-Velasquez, Damian GARCIA-Garcia and Jane DOE** had not received prior official authorization to come to, enter and reside in the United States, did bring to the United States said aliens and upon arrival did not bring and present said aliens immediately to an appropriate immigration officer at a designated port of entry; in violation of Title 8, United States Code, Section 1324(a)(2)(B)(iii).

And the complainant further states that this complaint is based on the attached statement of facts, which is incorporated herein by reference.

_____
SIGNATURE OF COMPLAINANT
James Trombley
Senior Patrol Agent

SWORN TO BEFORE ME AND SUBSCRIBED IN MY PRESENCE, THIS **28th DAY OF JANUARY, 2008**

_____
Barbara L. Major
UNITED STATES MAGISTRATE JUDGE

**CONTINUATION OF COMPLAINT:**
1.) Diego COLIO-Jimenez
2.) Joaquin CHAVEZ-Carbajal

## PROBABLE CAUSE STATEMENT

Furthermore, the complainant states that **Erika GARCIA-Martinez, Cecilia LOZANO-Velasquez, Damian GARCIA-Garcia, and Jane DOE** are citizens of a country other than the United States; that said aliens have admitted that they are deportable; that their testimony is material, that it is impracticable to secure their attendance at the trial by subpoena; and they are material witnesses in relation to this criminal charge and should be held or admitted to bail pursuant to Title 18, United States Code, Section 3144.

At approximately 10:33 a.m., the Border Patrol Dispatch center received a citizen's report of a white Dodge Caravan loading a group of suspected illegal aliens near a location known as South Cal Pine in the Chula Vista area of responsibility. This area is approximately 1.5 miles north of the U.S./Mexico international border and 1 mile east of the Otay Mesa, California Port of Entry. As this was being broadcast, Border Patrol Agent O. Perez spotted a white Dodge Caravan driving from the area of Cal Pine. At this time, Agent Perez was conducting sensor duties in an unmarked government vehicle and traveling the opposite direction. He was unable to safely follow the vehicle and relayed his observations to other Border Patrol units, including a CBP Air Operations helicopter. Due to Agent Perez' vehicle being identical to a Border Patrol vehicle, it was his belief that the driver of the white Caravan perceived him as associated with Border Patrol. The white Caravan sped off and was called out by Agent Perez as traveling into oncoming traffic. Several marked Border Patrol units responded and set up to intercept the white Caravan in anticipation of an immigration stop using lights and sirens. As the white Caravan continued down State Route 905 (SR-905), Supervisory Border Patrol Agent M. Diaz observed the white Caravan race through the intersection of SR 905 and La Media Road. Due to Agent Diaz' vehicle position, he was unable to initiate a pursuit. He relayed the white Caravan's position to other agents.

Just prior to reaching Cactus Road, Supervisory Border Patrol Agent J. Wallace, operating in plainclothes made an unsuccessful attempt to spike the white Caravan. The white Caravan continued westbound at a high rate of speed. Agent M. Ortiz began to follow at this time. During the white Caravan's travel from La Media to Heritage Road, Agent E. O'Connor, who was piloting the helicopter, observed the white Caravan weaving in and out of traffic. At Cactus Road, Agent A. Mayer fell in behind the vehicle and activated his emergency lights and sirens. After a short distance, Agent Mayer disengaged due to the white Caravan's erratic driving and knowledge that CBP Air Ops and unmarked Border Patrol units had joined the pursuit. During Agent Mayer's following of the white Caravan, he observed it run through two red lights, dangerously passing in the left turn lane of Cactus Road. Agent O'Connor then observed the fleeing white Caravan get boxed in by a semi-truck and another vehicle before driving onto the center median.

At this time, Agent Wallace observed the white Dodge Caravan traveling towards SR 905. The Caravan continued on SR 905 passing the end of the concrete K-rail and dropping out of Agent Wallace's sight near the intersection of the SR 905 and SR 805. When Agent Wallace regained observation of the vehicle, he saw the white Caravan traveling at approximately 80 miles an hour into the soft gravel and grass covered median. Due to the speed of the vehicle, the back end of it began to fish tail and lose traction. Agent Wallace observed the white Caravan as the driver overcorrected for the skidding and began to lose control of the vehicle. The white Caravan veered back onto the asphalt shoulder of SR 905 to regain traction. The vehicle was now out of control and rocketed over the two lanes of SR 905 and vaulted the curb on the right shoulder. Agent Wallace watched as the vehicle launched into the air and catapulted end over end at least two times. Agent Wallace observed at least two people ejected from the vehicle and flying through the air, then impacting on the side hill and roadway. Agent Wallace could also see large pieces of the white Caravan flying up into the air and crashing down around the accident scene.

CONTINUATION OF COMPLAINT:
1.) Diego COLIO-Jimenez
2.) Joaquin CHAVEZ-Carbajal

Agents Wallace, Ortiz, Mayer, G. Ballesteros and S. Smith arrived immediately and coordinated traffic control and a medical emergency response. Agent Wallace ran over to a subject later identified as defendant #2 **Joaquin CHAVEZ-Carbajal**, who was wearing a brown hooded sweatshirt and laying on the road surface against the curb on the northern shoulder of SR 905. Defendant CHAVEZ was clutching a cell phone in his hand. Agent Wallace determined that CHAVEZ was breathing and had a pulse. Agent Ballesteros also observed CHAVEZ, lying on the shoulder of the freeway. CHAVEZ appeared to be lucid and Agent Ballesteros noticed he was clutching a black Nokia cellular telephone. Agent Ballesteros told CHAVEZ to remain calm. CHAVEZ stated to Agent Ballesteros, "Help me, kill me, kill me." Agent Ballesteros felt CHAVEZ' response had a tone of regret.

It is Agent Ballesteros' experience that smugglers he has arrested in the past regularly use cellular phones and direct connect cell phones to communicate and coordinate their illicit smuggling activities. Due to his officer experience, defendant CHAVEZ' peculiar statement, and his clutching of the cellular telephone, Agent Ballesteros secured it as potential evidence. The telephone was found turned on when it was seized.

The defendant #1, **Diego COLIO-Jimenez**, was observed by Agent M. Dover seat-belted in the driver's seat. Agent Dover observed the white Caravan was still running and the transmission was in drive. As the scene was being stabilized, the engine compartment of the white Caravan ignited and Agents had to extinguish a fire that re-ignited several times. Defendant COLIO's legs were also trapped on the floor board and he was unable to be removed. Due to the fire threat, Agent Dover released the seat belt. Agent Kahl instructed Agent Dover to take photographs of the defendant as he laid seat-belted in the driver's seat. The defendant attempted to sit up and distance himself from his location at this time. Agent Kahl was first to arrive at the van to calm and stabilize the scene. Within minutes fire and paramedic services arrived and began to tend to the injured and fire hazard. The Jaws of Life were used to extract the defendant. All five of the passengers from the white Caravan were ejected and received significant injuries, including an unidentified female who was transported via life flight to Mercy Hospital.

Agent Kahl approached defendant CHAVEZ and asked him how he felt. CHAVEZ said that he felt "bad." When asked where he was injured, CHAVEZ pointed to his left leg, which appeared swollen and contorted. Agent Kahl reassured CHAVEZ that he was going to be okay and asked CHAVEZ his name and where he was from. The defendant answered that his name was Joaquin CHAVEZ-Carbajal and that he was from Chiapas, Mexico. CHAVEZ appeared to be very dirty and his pants below the knee were wet and covered with dirt and/or mud. This appeared to Agent Kahl to be consistent with someone who had illegally entered the United States on foot and walked a considerable distance through rough terrain and vegetation. CHAVEZ was later positively identified by fingerprints and had been previously arrested on two occasions by the Border Patrol. One of the ejected females was later identified as material witness **Erika GARCIA-Martinez** by fingerprints and by her Mexican Birth certificate, which was found in her jeans pocket. GARCIA-Martinez' clothing was wet, extremely dirty and muddy below her knees, consistent with her having recently crossed into the United States from Mexico on foot. GARCIA-Martinez was transported to Mercy Hospital for treatment. Fingerprint examination revealed that GARCIA-Martinez had four prior apprehensions by the Border Patrol. Records checks also revealed that GARCIA-Martinez had also been arrested by Border Patrol agents on January 20, 2008, in the same group as defendant CHAVEZ.

Another ejected female was found next to the passenger side of the Caravan, later identified as material witness **Cecilia LOZANO-Velasquez**. LOZANO's clothing was also very wet and extremely dirty. LOZANO was transported to Mercy Hospital for treatment. LOZANO was later identified by her fingerprints. LOZANO is a citizen and national of Mexico, illegally present in the United States. LOZANO had also been arrested by Border Patrol on January 20, 2008, in the same group as defendant CHAVEZ.

CONTINUATION OF COMPLAINT:
1.) Diego COLIO-Jimenez
2.) Joaquin CHAVEZ-Carbajal

A male was found ejected from the vehicle and later identified as material witness **Damian GARCIA-Garcia**. GARCIA-Garcia's clothing condition was also similar to the others. GARCIA-Garcia was placed into custody and was initially transported to Alvarado Hospital, but was later transferred to Mercy Hospital. GARCIA-Garcia was later identified by his fingerprints as, a citizen and National of Mexico, illegally present in the United States. GARCIA-Garcia was also previously arrested by the Border Patrol on January 20, 2008, with defendant **CHAVEZ** and witnesses LOZANO and GARCIA-Garcia. Another ejected female was not identified and was transported by helicopter for her serious injuries to Mercy Hospital as a "Jane DOE".

## STATEMENT OF DEFENDANT #1 : Diego COLIO-Jimenez

On January 25, 2008, defendant COLIO was advised of his Miranda Right in the Spanish language and agreed to speak without an attorney present. COLIO was asked if he felt clear headed and okay to answer questions and he stated that he did not. He stated that he had been given morphine intravenously about two hours prior and that he wished to sleep before answering questions. Agent Kahl ceased to question COLIO and at that time told him that he would be allowed to sleep for a few hours and that they would continue the interview later.

On January 26, 2008, COLIO provided Agent Kahl with a second videotaped post-Miranda statement in the Spanish language. Prior to COLIO's interview Agent Kahl re-read COLIO his Miranda rights in the Spanish language and asked if he understood those rights. COLIO said that he understood his rights and was willing to answer questions without the presence of an attorney. COLIO freely admitted to being a citizen and national of Mexico illegally present in the United States. COLIO was asked about circumstances of his being the driver of a minivan containing five other undocumented aliens which fled from Border Patrol Agents and later crashed.

COLIO initially stated that a friend of his known as "El Compa" had asked him for a favor, saying that he could make some money if he was motivated. He said that he had been offered the work by "El Compa" about two weeks ago at a party. He said that he was to have been paid $80.00 U.S. for each undocumented alien that he picked up and transported. COLIO stated that "El Compa" took him to a dead-end street in Otay Mesa, California and said that he was to pickup the people there and that it was to have been "El Compa's" cousin and her sister and one other person. COLIO claimed that he did not know that there would be other people. COLIO said that he was given the white minivan by another person, and that the vehicle belongs to "El Compa". COLIO said that this was the first time that he had worked as a load driver. COLIO stated that he drove to the area expecting three smuggled aliens but that five people then came out of the brush and got in his vehicle. Agent Kahl told COLIO that it was not believable to him that it was COLIO's first time working as a load driver, based on his reaction to the appearance of the Border Patrol units and the manner in which he had driven the minivan. COLIO admitted that he had lied and that it was in fact the fourth time that he had worked as a load driver. He stated that on the three prior occasions he had been successful picking up the aliens and had gotten away. He stated that he is paid $80.00 U.S. per undocumented alien whom he successfully smuggles, and the money is wired to him via Western Union three days after each smuggling event

When asked if he remembered driving in the "wrong-way" in the opposing lane on Otay Mesa Road, COLIO stated that he did not remember doing that. When asked, COLIO said that he had driven through two red traffic signals without stopping or slowing down. COLIO admitted that he had used the turn lanes and the shoulders of the highway to pass traffic in order to get away. When asked how fast he had been driving, COLIO said that he remembered driving one-hundred mile per hour.

CONTINUATION OF COMPLAINT:
1.) Diego COLIO-Jimenez
2.) Joaquin CHAVEZ-Carbajal

When specifically asked if he saw emergency lights or heard sirens behind him, COLIO stated that he doesn't remember hearing sirens, but that he did see Border Patrol units a great distance behind him with their emergency lights on. COLIO also stated that he had seen two plain clothes Border Patrol Agents in a jeep. When asked why he had not simply stopped the minivan, COLIO said that he hadn't stopped because he was afraid. He said that he was afraid that he would be sent to prison. When asked how the crash occurred, COLIO said that he attempted to make a turn and that he though that the van's breaks had failed.

COLIO was presented with a photographic line up and was not able to identify anyone in the group.

### STATEMENT OF DEFENDANT #2: Joaquin CHAVEZ-Carbajal

On January 25, 2008, CHAVEZ provided Agent Kahl with a videotaped post-Miranda statement in the Spanish language and was willing to answer questions without the presence of an attorney. CHAVEZ freely admitted to being a citizen and national of Mexico illegally present in the United States. When asked how he had become involved in the smuggling of undocumented aliens, CHAVEZ said that he had been offered work as an alien smuggling foot guide last Saturday by a friend named "Eduardo." He said that "Eduardo" had told him that he would be paid $150.00 U.S. for each alien he successfully smuggled into the United States. CHAVEZ said that he is aware that the people whom he is crossing do not have documents allowing them to enter the U.S. legally. He stated that he has guided groups of aliens on three occasions and has been caught each time.

As relates to the event on Tuesday, January 22, 2008, CHAVEZ said that he was given four undocumented aliens to cross, three of whom were the same subjects he had tried to smuggle before. . CHAVEZ said that he led the four smuggled aliens to a dead-end street near a factory. He stated that a Suburban was initially to have picked them up and then he was told that it would be a white van. After arriving at the street, CHAVEZ said that they waited about two minutes, at which time he received a phone call from the driver (which appeared in his phone as a private number). He said that the driver stated that he was almost there. CHAVEZ said that a white van pulled up, with a single male occupant. They all ran up to the van, and the driver told them in Spanish to get in. CHAVEZ said that they piled in the back of the van and hide. CHAVEZ said that they were all crouched down in the back of the vehicle and that none of them were wearing seatbelts. As the driver drove away, CHAVEZ said that he heard him saying on his cell phone that they were busted. The driver became really nervous and began driving really fast. He wasn't stopping for traffic lights and was going at an unsafe speed. They began asking the driver what had happened and he told them "We're going to go back to Tijuana!" He said that they (Border Patrol) had seen him and were following him. CHAVEZ said that he and the smuggled aliens could see how the guy was driving and were scared. They then heard a helicopter, and one of the ladies said that it was above them.

CHAVEZ said that the driver then cut really sharply and cut off a number of cars. He then blew through a red traffic light, and after passing the intersection, pulled over to the left hand side, leaving the road surface in order to pass more vehicles. One of the ladies was telling the driver to slow down. CHAVEZ said that the rear of the van was moving sideways and the driver tried to steer back onto the highway, but that he accelerated too much and lost control. CHAVEZ said that he didn't know if the van flipped over end over end or sideways, but said that it rolled up a hill and at that moment he lost consciousness. CHAVEZ said that he woke up lying on the road surface as the paramedics arrived.

CHAVEZ was presented with a photographic lineup and was able to identify photograph #5 as the driver of the van. Photograph #5 depicts defendant #1 Diego COLIO-Jimenez.

CONTINUATION OF COMPLAINT:
1.) Diego COLIO-Jimenez
2.) Joaquin CHAVEZ-Carbajal

## MATERIAL WITNESSES STATEMENTS:

Material witnesses, **Erika GARCIA-Martinez, Cecilia LOZANO-Velasquez and Damian GARCIA-Garcia** stated that they were citizens and nationals of Mexico illegally present in the United States. A four material witness only identified at this time as **Jane DOE** is currently at the hospital. January 23, 2008, material witness **Erika GARCIA-Martinez** provided Agent Kahl with a videotaped sworn statement in the Spanish language, which is summarized as follows:

GARCIA-Martinez freely admitted to being a citizen and national of Mexico illegally present in the United States. GARCIA-Martinez stated that she arrived in Tijuana via plane on Saturday January 5, 2008, together with her husband witness **Damian GARCIA-Garcia**. She stated that someone they knew by the name of Leonardo, had made the arrangements for them to be smuggled into the United States. She said that she was aware that they would have to pay a smuggling fee after arrival. She stated that their final destination was to have been Los Angeles, California. She stated that a smuggler had been waiting for them there at the airport and that from there they got into a taxi and were taken to a house. GARCIA-Martinez was asked to describe the circumstances of her prior apprehension on Sunday January 20, 2008, and stated that there were four undocumented aliens, including herself and her husband, and that they were crossed by the same foot guide who was involved in today's event.

She said that they crossed in a hilly area where there was a single laminate border fence. She stated that the guide was leading them. She said that they were all arrested by a Border Patrol. GARCIA-Martinez said that upon being returned to Mexico, the foot guide took them back to the stash house in Tijuana. Regarding her current apprehension, GARCIA-Martinez stated that they were smuggled into the U.S. by the same foot guide through the same area. She said that there were four smuggled aliens; herself, her husband, a woman named Cecilia and another unidentified woman. GARCIA-Martinez was shown photograph of one of the four suspected smuggled aliens, a "Jane Doe" who was still in critical but stable condition at Scripps Mercy Hospital, and she positively identified the woman as the fourth smuggled alien.

When the group reached the highway, they were picked up by a load vehicle with two occupants, a male in the driver's seat and a female in the passenger's seat. She stated that she could not remember the vehicle's color. GARCIA-Martinez said that she believed that the female in the passenger's seat got out of the vehicle, as the group was getting in. GARCIA-Martinez said that the foot guide told them all to get in and to sit in the rear of the vehicle. She stated that she sat in the rear seat on the driver's side beside her husband and the unidentified lady. GARCIA-Martinez said that she thought that the person in the passenger seat had gotten back in the car, but wasn't sure. GARCIA-Martinez said that the foot guide was in the passenger seat and that he had his cellular phone. She stated the vehicle was moving normally at first then the driver started to speed up. GARCIA-Martinez said that they didn't have seatbelts on and that they could feel themselves being tossed around in the back of the vehicle. She said that the driver said they were being followed. Later, Cecilia, one of the smuggled aliens said they were being followed also, and told the driver to go faster.

GARCIA-Martinez said that she couldn't remember anything else leading up to the crash, and that she thought that she had lost consciousness in the crash. She said that when she woke up she was next to her husband. She stated that she did not remember where the driver or the others had ended up after the crash. When asked if she thought that the foot guide and driver knew that they were illegally in the U.S., GARCIA-Martinez said that they did know the people were illegal. GARCIA-Martinez was presented with a photographic lineup and was able to identity photograph #2 as the foot guide who had guided them across on Sunday and in yesterday's event. Photograph #2 depicts defendant #2 Joaquin **CHAVEZ-Carvajal**.

**CONTINUATION OF COMPLAINT:**
1.) Diego COLIO-Jimenez
2.) Joaquin CHAVEZ-Carbajal

Executed on January 27, 2008 at 10:00 A.M.

Carlos R. Chavez
Senior Patrol Agent

On the basis of the facts presented in the probable cause statement consisting of 6 pages, I find probable cause to believe that the defendant named in this probable cause statement committed the offense on January 22, 2008, in violation of Title 8, United States Code, Section 1324.

Peter C. Lewis
United States Magistrate Judge

1-27-08 @ 10:28 A.M.
Date/Time